95 So.2d 909 (1957)
In the matter of Dubell B. DUKE and Hethie Duke, husband and wife, Adoption.
Supreme Court of Florida, En Banc.
June 12, 1957.
D.J. Bradshaw and Geo. W. Scofield of Scofield & Bradshaw, Inverness, for appellants.
Roger D. Flynn, Tampa, and Albert W Graessle, Jr., Jacksonville, for appellee.
TERRELL, Chief Justice.
Dubell B. and Hethie Duke, husband and wife, petitioned the Circuit Court of Hillsborough County to adopt a girl child about two and one-half years of age named Jeannie Marie Ellison. Mr. and Mrs. Duke were at the time of the petition 48 and 63 years old respectively. Both were shown to be in good health, of good moral character, industrious, of Christian conviction, owned a modest home free of incumbrances, had an annual income of considerably more than $3,000, were respectable citizens and apparently well adjusted. They had been married 20 years without rift or separation in the domestic climate and the child in question had been in their possession for one and one-half years. It was turned over to them by the natural father, they had fed, nourished and restored it to normal health and had become attached to it.
At final hearing the chancellor denied the petition for adoption because (1) petitioners were not of suitable age; (2) petitioners' financial structure was not such as to safeguard the welfare of the child; (3) the child's natural mother did not give her consent to the adoption; (4) the best interest of the child would not be served by granting the adoption. The final decree further ordered that the care, custody and control *910 of the child, be placed in the Tampa Children's Home for the purpose of placement or adoption and that the State Welfare Board take immediate custody of and hold it pending delivery by the State Welfare Board to the Tampa Children's Home for placement as ordered. This appeal is from the final decree so entered.
We think the chancellor applied the wrong test to determine the qualification of petitioners for adoption. It is true that the Dukes are not what we recognize as young people, but they are by no means old as that term is at present applied; they were shown to be in good health, were not in their dotage, had no children of their own and wanted this one. As already pointed out, the Dukes had been in possession of the child for a year and one-half during which, so far as the record discloses, their custody was not interfered with nor is there showing that their love and affection for it was not genuine. They voluntarily proposed to adopt it, enabling it to be a part of and to inherit from them. To be brought up in a modest home by poor but honest and industrious parents is a great heritage. That and performance of the daily chores is the means by which we imbibe courtesy and respect for the rights of others by precept and example. It is the means by which we become kind and considerate, even to dumb animals, grow into the well adjusted personality and leave no tracks for the sheriff or policeman to run down.
As to the income of petitioners, the record shows it to be well over $3,000 per year. I doubt if there is a man on this court whose father and mother had an income of more than $3,000 at the time he was being brought up. A study of the life of those who have made "Who's Who" reveals that they invariably came from homes supported by very modest incomes, many of them as low as $500 or $600 per year. I do not overlook the fact that in those days dollars often looked like cart wheels and one of them would buy sirloin enough for Sunday dinner for a large family and leave enough for hash and gravy to make Monday's grits fit for a king. We do not overlook the fact that income is an important consideration in providing for the care and rearing of an infant but there are other important factors. The intangibles  love, affection, instructive companionship and devotion to high principles  also play an important role in the development of good character and citizenship.
We do not discount the fact that what an infant eats and wears is important but in appraising that which is for his best interest, age and income of the proposed foster parents are relative and should not necessarily conclude the question. It would be mistaken logic to conclude that a man and wife the age and income of petitioners were not competent to adopt an infant child when other factors that enter into the transaction are present and press for consideration. One with ten times the income and much younger might not be near so good a risk.
In a democracy like ours many elements are essential to the making of a competent citizen; some are tangible, others are intangible; both are important; rarely if ever will the infant be exposed to all of them; potential parents are not usually packed with them. The skill and wisdom of the chancellor is best demonstrated by discerning where the infant will be exposed to most of them and placing him there. It is not a question of perfection but one of reducing error to the minimum in the light of the facts before him.
We do not think this rule was observed so the judgment is reversed with directions to enter judgment in favor of petitioners the record showing nothing to the contrary.
Reversed.
THOMAS, HOBSON, ROBERTS and THORNAL, JJ., concur.
DREW and O'CONNELL, JJ., dissent.
*911 DREW, Justice (dissenting).
In this case we are dealing with the whole future life of a little girl, not the right of the petitioners to the possession of a chattel. Our first and paramount consideration should be the welfare of the child. In all of the cases it has been said that this premise is the foundation on which these cases rest but I fear that the circumstances surrounding the early life of this child and the manner in which these petitioners received possession of her and nurtured and cared for her in her extreme infancy has blinded the court to such an extent that the majority opinion does violence to this cardinal concept.
This case was extensively heard on two separate occasions by an able trial judge. It is of profound importance that in our review the intangible and unreportable aspects of personality of the prospective parents are not available to us as they were to him. We have never looked into the eyes of either the petitioners or the child. The simple fact is that in this case the probabilities are that his judgment is better than ours.
This is not a case where a parent or other relatives seek adoption. Moreover, it is obvious that the child has not been in the possession of these petitioners for more than a year. The alternative to adoption by petitioners is indicated by the original order of the lower court granting custody and control of the child to the Tampa Children's Home "for the purpose of future adoptive placement by the said licensed child placing agency." An expert witness testified in the hearings that there were many more applicants than children at this placement agency.
Selecting foster parents who show the highest probability of being able to provide for the continuing spiritual, social and economic welfare of the child, is the main purpose of cases of this kind. The problems of today are not the same as they were a generation ago. A contrast of old settings with new is drawn by Robert P. Knight, M.D. in his article, Some Problems Involved in Selecting and Rearing Adopted Children: "Within the past twenty or twenty-five years there have been tremendous changes in the social attitudes and methods regarding children who have lost their parents. This sociological revolution can best be thrown into clear relief by contrasting the former distressing system of `orphan asylums' and haphazard adoptions with the present system of temporary children's institutions, foster homes and child placement agencies with highly trained personnel." Bulletin of the Minninger Clinic, May, 1941, p. 65.
Mr. and Mrs. Duke rely heavily on In re Adoption of Brown, Fla. 1956, 85 So.2d 617, but I am not persuaded that this case is authority for them. It is clear that the trial court did not rely on age alone but based its conclusion upon many factors which combined to make the adoption unsuitable. The trial court said:
"It is true, of course, that age is not the deciding factor in a proceeding of this kind, nevertheless, it is a factor to be considered in the entire picture, particularly the age of the adopting mother in relation to a girl child about 2 1/2 years of age. Likewise it is clear from the testimony that the income of the parties is limited."
There is nothing in this record which reflects upon the good character and reputation of Mr. and Mrs. Duke. What they have done for this child is to be highly commended. They nurtured and cared for her as their own and it may well be said that the child is alive today because of their interest in her. Nevertheless, and in spite of my deep and profound sympathy for these two people, to me the conclusion is inescapable that the welfare of this child and its future will be better served by accepting the recommendations of the Welfare Board and affirming the decision of the learned chancellor below. It may well be that on mature reflection these people may reach the conclusion, as did the real mother in *912 the famous trial before Solomon, that the chancellor's disposition of the case was in the best interest of the child.
O'CONNELL, J., concurs.